NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                  )
JOANNE BINTLIFF-RITCHIE,                           )
                                                  )
              Plaintiff,                           )
                                                  )        Civil Action No. 05-3802 (GEB)
       v.                                          )
                                                  )        **MEMORANDUM OPINION**
AMERICAN REINSURANCE COMPANY,                      )
                                                  )
              Defendant.                           )
_____)

**BROWN, Chief Judge**

        This matter comes before the Court upon the Motion for Summary Judgment of

Defendant American Reinsurance Company ("American Re" or "Defendant") against Plaintiff

Joanne Bintliff-Ritchie ("Bintliff-Ritchie" or "Plaintiff"). The Court has fully reviewed all

documents filed and submitted and has decided the motion without oral argument pursuant to

Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court grants Defendant's

motion for summary judgment.

## I.        BACKGROUND

        This case arises out of the dismissal of Plaintiff from her position as American Re's

Senior Vice-President, Corporate Resources, on March 25, 2004.

        Defendant American Re is a corporation headquartered in Princeton, New Jersey. (Def.

Stat. at ¶ 1, Pl. Stat. Resp. at ¶ 1.) Defendant provides insurance, reinsurance and related services

to insurance companies, large businesses, government agencies and self-insurers. (Def. Stat. at ¶

1, Pl. Stat. Resp. at ¶ 1.)  Plaintiff was employed by American Re as Senior Vice-President,

Corporate Resources from January 6, 2003 to March 25, 2004.   (Def. Stat. at ¶ 2, Pl. Stat. Resp. at ¶ 2.)

Ms. Bintliff-Ritchie was hired to replace Robert Humes, who held the title of Senior Vice-President, Human Resources.  (Def. Stat. at ¶ 3, Pl. Stat. Resp. at ¶ 3.)  Mr. Humes announced his intent to retire from American Re in the summer of 2002.   (Def. Stat. at ¶ 3, Pl. Stat. Resp. at ¶ 3.)  Plaintiff submitted her application for the soon-to-be-vacated position to Wolfgang R. Engshuber ("Engshuber"), American Re's Executive Vice-President and President, Corporate Centers, on July 9, 2002.  (Def. Stat. at ¶ 4, Pl. Stat. Resp. at ¶ 4.)   Plaintiff was interviewed by Mr. Humes, Mr. Engshuber, Albert J. Beer ("Beer") (American Re's Executive Vice-President and President, Strategic Business Units) and John P. Phelan ("Phelan") (American Re's Chairman and Chief Executive Officer) in October and November 2002.    (Def. Stat. at ¶ 5, Pl. Stat. Resp. at ¶ 5.)  At all times relevant to this matter, Messrs. Engshuber, Beer and Phelan constituted American Re's Executive Committee.    (Def. Stat. at ¶ 6, Pl. Stat. Resp. at ¶ 6.)  Mr. Engshuber and Mr. Beer reported to Mr. Phelan.  (Def. Stat. at ¶ 6, Pl. Stat. Resp. at ¶ 6.)

American Re claims that Mr. Humes, Mr. Engshuber and George Roberts (American Re's Senior Vice President and Senior Vice President and President, American Re Broker Market) also interviewed Carl Sullo, a male candidate for the position, on November 6, 2002.    (Def. Stat. at ¶ 8, Pl. Stat. Resp. at ¶ 8.)  American Re claims that Mr. Sullo was considered a qualified candidate.  *Id.*  The position was, however, eventually offered to Ms. Bintliff-Ritchie in December 2002.  (Def. Stat. at ¶ 9, Pl. Stat. Resp. at ¶ 9.) Plaintiff insists that she was the only candidate for the job as of the date it was offered to her.  (Pl. Stat. Resp. at ¶ 8.)  Plaintiff

accepted the offer of employment approximately one week after it was extended to her.  (Def. Stat. at ¶ 13, Pl. Stat. Resp. at ¶ 13.)  Plaintiff had not received any other offers of employment prior to her acceptance of American Re's offer, although she claims to have been "actively engaged" in pursuing job opportunities with other potential employers.   (Def. Stat. at ¶ 14, Pl. Stat. Resp. at ¶ 14.)

Plaintiff began work at American Re on January 6, 2003. (Def. Stat. at ¶ 15, Pl. Stat. Resp. at ¶ 15.)  She reported directly to Mr. Engshuber. *Id.*  Ms. Bintliff-Ritchie's starting annual salary was $215,000.   (Def. Stat. at ¶ 16, Pl. Stat. Resp. at ¶ 16.)  Plaintiff was also eligible to participate in American Re's annual Incentive Compensation Plan (ICP).  (Def. Stat. at ¶ 17, Pl. Stat. Resp. at ¶ 17.)  ICP awards for the year 2003 were paid out in March 2004.  (*Id.*)  Ms. Bintliff-Ritchie understood that she was an at-will employee, and therefore understood that both she and American Re were free to terminate their employment relationship at any time.  (Def. Stat. at ¶¶ 19-20, Pl. Stat. Resp. at ¶¶ 19-20.)

Upon joining American Re, Ms. Bintliff-Ritchie began to restructure the Corporate Resources Department.   (Def. Stat. at ¶ 23, Pl. Stat. Resp. at ¶ 23.)  In particular, Plaintiff sought to hire more males to balance the gender ratio in the department.  (Def. Stat. at ¶ 25, Pl. Stat. Resp. at ¶ 25.)  Mr. Phelan and Mr. Engshuber approved Ms. Bintliff-Ritchie's proposed restructuring in March 2003.  (Def. Stat. at ¶ 24, Pl. Stat. Resp. at ¶ 24.) The restructuring led to the departure of six (6) female employees from the department,  (Def. Stat. at ¶ 26, Pl. Stat. Resp. at ¶ 26.), and the arrival of at least five (5) male employees, including Mark New (Vice-President, People Effectiveness), and Willie Kelly (Strategic Business Partner).  (Def. Stat. at ¶ 27, Pl. Stat. Resp. at ¶ 27.)  As part of her duties, Ms. Bintliff-Ritchie also personally

recommended amendments to the 2003 and 2004 ICP to require that any recipients be actively employed by American Re on the date of the awards to benefit from the program.  (Def. Stat. at ¶¶ 30-32, Pl. Stat. Resp. at ¶¶ 30-32.)  On July 1, 2003, after Ms. Bintliff-Ritchie's first six months at American Re, Mr. Phelan approved, upon Mr. Engshuber's recommendation, a 21% (or $45,000) salary increase for Plaintiff.  (Def. Stat. at ¶ 29, Pl. Stat. Resp. at ¶ 29.)

In January 2004, Ms. Bintliff-Ritchie completed the self-evaluation portion of the 2003 year-end Performance Management & Development Plan.  (Def. Stat. at ¶ 33, Pl. Stat. Resp. at ¶ 33.) She sent her self-evaluation by email to Mr. Engshuber on January 23, 2004.  *Id.*  The self-evaluation scale had 4 possible ratings: "O" (Outstanding), "E" (Effective), "N" (Needs Improvement), and "U" (Unsatisfactory).   (Def. Stat. at ¶ 34, Pl. Stat. Resp. at ¶ 34.)  Ms. Bintliff-Ritchie rated herself as an "N," for Needs Improvement.  *Id.*   Ms. Bintliff-Ritchie acknowledged that she devoted a lot of care and attention to filling her evaluation.  (Def. Stat. at ¶ 36, Pl. Stat. Resp. at ¶ 36.)

American Re alleges that an internal survey conducted in the first quarter of 2004 indicated that the Corporate Resources department was deemed the poorest performing department – among the six direct reports to Mr. Beer – with a satisfaction rating of 90%.   (Def. Stat. at ¶ 41, Pl. Stat. Resp. at ¶ 41.) The next lowest rated department had a rating of 133%. (Def. Stat. at ¶ 41, Pl. Stat. Resp. at ¶ 41.)

On March 15, 2004, the Executive Committee approved Ms. Bintliff-Ritchie's anticipated ICP award in the amount of $112,500.  (Def. Stat. at ¶ 49, Pl. Stat. Resp. at ¶ 49.)  That amount represented only 90% of Plaintiff's target award of $125,000.  (Def. Stat. at ¶ 49, Pl. Stat. Resp. at ¶ 49.)  American Re's ICP bonuses can range between 0% and 200% of target values.  (Def.

Stat. at ¶ 49, Pl. Stat. Resp. at ¶ 49.)   Three of the seven Senior Management Group ("SMG")

members reporting to Mr. Engshuber in January 2003 were female.  (Def. Stat. at ¶ 18, Pl. Stat.

Resp. at ¶ 18.)  As of March 2004, two of the four SMGs reporting to Mr. Engshuber were

female.   (Def. Stat. at ¶ 51, Pl. Stat. Resp. at ¶ 51.) Among those SMG members, Plaintiff had

the lowest anticipated bonus and the only one below target.  (Def. Stat. at ¶ 51, Pl. Stat. Resp. at

¶ 51.)  Melissa Salton (Senior Vice President and Chief Results Monitoring & Reporting

Officer), another female SMG, received the highest ICP – an award 47% higher than plaintiff's

award, and 6% higher than that of the highest male recipient.  (Def. Stat. at ¶ 51, Pl. Stat. Resp. at

¶ 51.) On March 24, 2004, American Re terminated plaintiff's employment, and dismissed Mr.

New and Mr. Kelly.  (Def. Stat. at ¶¶ 52-54, Pl. Stat. Resp. at ¶¶ 52-54.)

## II.    DISCUSSION[1]

### A.    Motion to Dismiss Under FED. R. CIV. P. 12(b)(6).

Defendant contends that this Court should dismiss (i) Plaintiff's purported New Jersey

Wage Payment Law claim and (ii) Plaintiff's Fraud claim, on the grounds that they fail to state a

claim as a matter of law.   This Court will grant Defendant's request as to those claims.

#### 1.    Standard.

A rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be

granted must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts

---

[1]    The Court notes that while Defendant has styled its motion as one for summary judgment – as it certainly is insofar as it seeks a judgment that neither Title VII nor New Jersey's Law Against Discrimination ("LAD") were violated in dismissing Ms. Bintliff-Ritchie – the Court will apply the standards of Federal Rule of Civil Procedure 12(b)(6) in assessing whether Counts III and IV of Plaintiff's complaint should be dismissed for failure to state a claim as a matter of law.

in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980).  "The question before the court is not whether plaintiffs will ultimately prevail; rather, it is whether they can prove any set of facts in support of their claims that would entitle them to relief." *Mobile Dredging & Pumping Co. v. City of Gloucester*, No. 04-0624, 2005 U.S. Dist. LEXIS 16601, at *7 (D.N.J. Aug. 4, 2005), *citing Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). "Therefore, in deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the nonmovant, plaintiff's allegations state a legal claim."  *Mobile Dredging*, at *7, *citing Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990).

> 2.      Application.
>
>> a.      The Wage Payment Law Claim Fails as a Matter of Law
>>         and Must be Dismissed.

Defendant argues that Count III of Plaintiff's Complaint – in which Plaintiff sets forth the argument that Defendant violated the New Jersey Wage Payment Law by failing to pay her the 2003 ICP bonus after her termination  – fails to state a claim as a matter of law and should therefore be dismissed.  This Court agrees.

Plaintiff's Complaint alleges, in essence, that "[b]y refusing to pay Ms. Bintliff-Ritchie the $112,500 incentive pay that she earned, Am Re violated the New Jersey Wage Payment Law, N.J. Stat. Ann. § 34:11-4.3."  Compl. ¶ 34.  That provision states, in part:

> Whenever an employer discharges an employee, or when the work
> of an employee is suspended as a result of a labor dispute, or when
> an employee for any reason whatsoever is laid off, or whenever an
> employee quits, resigns, or leaves employment for any reason, the

6

> employer shall pay the employee all wages due not later than the
> regular payday for the pay period during which the employee's
> termination, suspension or cessation of employment (whether
> temporary or permanent) took place, as established in accordance
> with section 2 of this act; or in the case of employees compensated
> in part or in full by an incentive system, a reasonable
> approximation of all wages due, until the exact amounts due can be
> computed . . . .

N.J.S.A. § 34:11-4.3.

American Re argues that the ICP award sought by Ms. Bintliff-Ritchie does not constitute "wages" under the Wage Payment Law. *See* Def. Br. at 26, *quoting* N.J.S.A. 34:11-4.1(c) (defining wages as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis *excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto*.") (emphasis added). American Re contends that this must lead to the conclusion that failure to disburse the ICP award to Ms. Bintliff-Ritchie cannot constitute a violation of the Wage Payment Law.

In response, Plaintiff submits to the Court that N.J.S.A. § 34:11-4.3 – and in particular, the language providing that an employer shall pay "in the case of employees compensated in part . . . by an *incentive system*, a reasonable approximation of all wages due . . . ." – compels the finding that the ICP award should be considered part of her wages under the Wage Payment Law. *See* Pl. Opp'n at 18, *quoting* N.J.S.A. § 34:11-4.3 (emphasis added). Plaintiff claims that the ICP was due for her 2003 performance, "a period measured from January 2003 through December 31, 2003," and contends that the Executive Committee "approved th[e] recommendation [of a $125,000 bonus] on or about March 15, 2004." Pl. Opp'n at 18-19.

The Court does not find Plaintiff's argument persuasive. Ms. Bintliff-Ritchie appears to

7

rely solely on the statute's reference to "incentive systems" in drawing a parallel with American Re's Incentive Compensation Plan.  That is misleading.

In *Mulford v. Computer Leasing, Inc.*, 334 N.J. Super. 385 (Sup. Ct. N.J. Law. Div. 1999), for example, the incentive system at issue involved the payment of commissions to a salesman for every sale performed.  *Id.* at 390-91.  While the sum of the commissions was only paid to the salesman on a quarterly basis, the salesman's interest in the commissions *vested* upon completion of the sale. *See id.*, at 392 ("The fact that Mulford was terminated from employment . . . in February 1996, cannot alone adversely effect his right to commissions *earned*.") (emphasis added).  The court therefore found that Mr. Mulford was entitled to be paid for the commissions he had earned prior to his dismissal.  *Id.* at 393.

Similarly, in *Feldman v. U.S. Sprint Comm. Co.*, 714 F. Supp. 727 (D.N.J. 1989), a sales representative for Sprint sued his employer on the grounds that Sprint had withheld the commissions on sales the employee had completed prior to leaving the company.  While payments of commissions generally occurred four months after the sale, and while the commissions sought by Plaintiff were to be paid after his departure from the company, the court found that Sprint could not benefit from the delayed payment scheme to deprive plaintiff of the commission which he had earned.  *Id.* at 732.

In the case at bar, however, Ms. Bintliff-Ritchie's interest in the ICP award had not yet vested under the ICP system. The rules governing the ICP awards,  endorsed by plaintiff herself, provide as follows:

> Q: Who is eligible to participate in the Senior Executive Annual
> Incentive Compensation Program?
> A: All members of American Re's Senior Management Group are
> eligible to participate in the Senior Executive Annual Incentive

> Compensation Program . . . .
> Q: When are ICP awards paid?
> A: Awards are typically paid in March following the completion of each performance period on December 31.  Awards are only paid to those employees who are eligible to receive an award. . . .
> Q: If an employee leaves American Re prior to payout will he or she be eligible for the annual incentive award?
> A: *Employee who voluntarily or involuntarily leave American Re prior to the payment of achieved incentive awards, will forfeit the award regardless of whether they completed the performance period or not.*

Certification of Robert Bernstein ("Bernstein Cert."), Ex. K (emphasis added).

Since Plaintiff was dismissed from her position at American Re in March 2004 (before the 2003 ICP awards were paid) she was plainly ineligible for the award under the ICP rules.[2] Accordingly, she cannot claim that her interest in the anticipated $112,500 ICP award had vested. In this case, therefore, unlike in *Mulford* and *Feldman*, the Plaintiff's interest in the funds at issue is not protected by N.J.S.A. §§ 34:11-4.1(c) and 34:11-4.3.

For the foregoing reasons, this Court finds that Plaintiff has failed to state a claim which would entitle her to relief.  She cannot recover the ICP funds she seeks under the New Jersey Wage Payment Law.  *See Sluka v. Landau Uniforms*, 383 F. Supp. 2d 649, 656 (D.N.J. 2005) (holding that the Wage Payment Law did not apply to bonus, because bonus was not "wage" under the statute).  Plaintiff's Count III will therefore be dismissed without prejudice.

        b.      Plaintiff's Common Law Fraud Claim Fails as a Matter of Law and Must be Dismissed.

Defendant argues that Plaintiff's allegation of fraud, in Count IV of its Complaint, fails to meet the pleading requirements of Federal Rule of Civil Procedure 9(b).

---

[2]     Plaintiff cannot deny the plain meaning of the ICP rules, and can do little more than state that while she approved the language of the ICP, she "never intended the [ICP] to be used as a pretext for 'fraud and deceit.'" Pl. Stat. Resp. ¶ 32.

9

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). "[A] plaintiff can meet this heightened pleading standard by alleging the identity of the person who made the alleged misrepresentation, the general content of the misrepresentation, along with the date, place and time the representation was made." *Folkman v. Roster Fin., LLC*, No. 05-2099, 2005 WL 2000169, at *5 (D.N.J. Aug. 16, 2005), *citing Lum v. Bank of America*, 361 F.3d 217, 224 (3d Cir. 2004).

This Circuit has, however, been relatively flexible in its application of Rule 9(b). "Plaintiffs are[, for example,] free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (holding that plaintiffs, by identifying with specificity the pieces of machinery that were the subject of the alleged fraud, and the nature and subject of the alleged misrepresentation, could withstand a motion to dismiss under 9(b) despite their failure to "describe the precise words used."); *see also United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1125-26 (E.D. Pa. 1991) (holding that plaintiff had met 9(b) standards by identifying the time period during which the alleged fraud occurred and identifying some of the locations of the alleged fraud). Courts may also relax the requirements of Rule 9(b) upon a showing that the necessary "factual information is peculiarly within the defendant's knowledge or control." *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989).

In the case at bar, Plaintiff claims that American Re personnel made material and either negligent or willful misrepresentations of the employment climate at their company to induce her into accepting American Re's offer of employment. Compl. ¶¶ 35-42. Plaintiff further claims

10

that those misrepresentations were made with the expectation that she would rely on them to accept the offer.  Ms. Bintliff-Ritchie now alleges that she did in fact rely on those statements in accepting the position at American Re.  *Id.*

In moving to dismiss Count IV, Defendant argues principally that Plaintiff failed to identify the nature of the statements allegedly made by American Re personnel, and fails to identify the American Re employee(s) proffering those statements. Defendant concludes that Plaintiff's Complaint cannot therefore meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  Def. Br. at 28-31.

Plaintiff responds by claiming that the nature of the statements made by American Re's executives and the names of the individuals proffering those statements are clearly set out in her opposition papers.  In particular, Ms. Bintliff-Ritchie argues that her submissions to the Court establish that members of the Executive Committee told her that they were looking for someone who would fundamentally change and improve the organization.  Pl. Opp'n at 22, *quoting* Pl Stat. Resp. at ¶¶ 9-11.  Ms. Bintliff-Ritchie's opposition brief further alleges that she was assured by the members of the Executive Committee that they would support her in implementing her proposed changes to the Department.  Pl. Opp'n at 22-23.

Plaintiff's arguments are, however, unavailing.  This Circuit has long held that "a contention in a brief clearly may not be used to substitute for an allegation in a complaint, especially in the context of a fraud claim, which must be pled with particularity under Fed. R. Civ. P. 9(b)."  *Dongelewicz v. PNC Bank Nat'l Ass'n*, 104 Fed. Appx. 811, 819 n.4 (3d. Cir. 2004), *cert. denied,* 73 U.S.L.W. 3414 (U.S. Jan. 18, 2005) (No. 04-647), *quoting Williams v. New Castle County*, 970 F.2d 1260, 1266 n.4 (3d Cir. 1992) (quotations omitted).  It is beyond

11

contention that Plaintiff's Complaint, on its face, fails to provide any indication of the date, place and time the alleged representations were made. *See Folkman*, at *5. While the information put forth by Plaintiff in its opposition brief and fact statements may well ultimately satisfy the requirements of Federal Rule of Civil Procedure 9(b), Plaintiff cannot escape the fact that its Complaint, in its present form, does not.

Accordingly, this Court finds – looking to the face of the complaint and taking all of the allegations of fact as true and construing them in a light most favorable to the nonmovant – that Plaintiff has failed to plead its claim of fraud with sufficient particularity. The Court will therefore dismiss Count IV for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

### B.     Motion for Summary Judgment

#### 1.     Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P.  56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*,

811 F.2d 225, 231 (3d Cir. 1987).

      2.     Application

American Re claims that it is entitled to summary judgment that it did not discriminate against Ms. Bintliff-Ritchie on the basis of her gender in violation of Title VII and New Jersey's Law Against Discrimination.  The Court will grant summary judgment on this issue.

"Section 703(a) of Title VII forbids an employer- (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . sex." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 751-52 (1998) (quotations omitted), *quoting* 42 U.S.C. § 2000e-2(a)(1). The New Jersey Law Against Discrimination ("LAD") provides, for its part, that:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a. For an employer, because of the . . . sex . . . of any individual . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

N.J.S.A. § 10:5-12.  Since "[a]nalysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim," this Court will review the validity of Plaintiff's Counts I and II concurrently.   *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999); *see also Zalewski v. Overlook Hosp.*, 300 N.J. Super. 202, 206 (Super. Ct. N.J. Law Div. 1996) ("New Jersey courts have traditionally looked to the Title VII cases as a 'key source of interpretive authority' when dealing with claims under the LAD."), *quoting Grigoletti v. Ortho. Pharm.*

*Corp.*, 118 N.J. 89, 97 (1990).

"To prevail on a claim for sex discrimination under Title VII [plaintiff] must satisfy the three-step burden-shifting inquiry under *McDonnell Douglas Corp. v. Green* . . . ."  *Atkinson v. Lafayette College*, 460 F.3d 447, 454 (3d Cir. 2006), *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). "First, [Plaintiff] must establish a prima facie case of sex discrimination. If she succeeds, the burden shifts to [Defendant] to advance a legitimate, non-retaliatory reason for its action." *Atkinson,* at 454, *citing McDonnell Douglas*, at 802-03.  If Defendant "advances such a position, the burden shifts back to [Plaintiff] to prove that the nondiscriminatory explanation is merely a pretext for discrimination." *Atkinson*, at 454*; see also Colussi v. Woodruff Family Servs., LLP*, 173 Fed. Appx. 118, 121 (3d Cir. 2006) (court applying three-step *McDonnell Douglas* framework to gender discrimination claims, and holding that plaintiff must, at third step of the analysis, "point to evidence either that the articulated reason should be disbelieved or that gender bias was more likely than not a motivating or determinative cause of the decision.") (quotations omitted), *quoting Fuentes v. Perskie*, 32 F.3d 759, 763-65 (3d Cir. 1994).

American Re concedes that Ms. Bintliff-Ritchie may have established a prima facie case of discrimination.[3] It argues that it is nevertheless entitled to summary judgment (i) because it has met its burden of proving that the decision to terminate plaintiff's employment was based on her performance, and (ii) because Plaintiff has failed to establish that Ms. Bintliff-Ritchie's poor performance was only a pretext for gender discrimination.  Def. Br. at 17.

First, American Re claims that the evidence it has proffered to the Court demonstrates

---

[3]      The Court notes that American Re only concedes that Plaintiff may have done so "for the purposes of [Defendant's] motion . . . ."  Def. Br. at 17.

that it terminated Plaintiff for a legitimate, non-discriminatory business reason – i.e. on the grounds that "the Executive Committee was dissatisfied with her job performance." *Id.* at 18. American Re urges the Court to disregard Plaintiff's opinion that she was performing her job satisfactorily, arguing that Courts in this Circuit have "admonished that a plaintiff's subjective opinion or her own performance is of no moment, and a plaintiff's mere disagreement with her employer's business decisions is insufficient to establish pretext." *Id*. at 20.  American Re claims in particular that:

- The decision to terminate Ms. Bintliff-Ritchie was made by the same individuals who hired her 15 months earlier.

- Ms. Bintliff-Ritchie awarded herself an "N" for Needs Improvement in her self-assessment emailed to Mr. Engshuber on January 23, 2004.

- Plaintiff was allegedly responsible for the planned contracting with Synhrgy to outsource American Re' human resources functions, a contract which plaintiff was forced to cancel under pressure from the Executive Committee.

- Of Mr. Beer's direct reports, Plaintiff's department was ranked last in an internal survey completed in the first quarter of 2004.

- Mr. Phelan was angered by plaintiff's alleged warning to Ms. Luongo, a female subordinate, that her employment would be terminated if she failed to find another job in the company within three months – in direct contravention of Mr. Engshuber's orders that no such decision be made without his approval.

- Mr. Engshuber allegedly criticized Ms. Bintliff-Ritchie's performance in his 2003 year-end evaluation.

- The Executive Committee approved Ms. Bintliff-Ritchie's 2004 ICP bonus award in an amount lower than her target amount, and in an amount lower than the ICP awards for any of the other SMG members reporting to Mr. Engshuber.

Def. Br. at 21-22. American Re concludes that the record supports its contention that Ms.

Bintliff-Ritchie's sub-par performance led to her dismissal, and that Defendant has therefore met its burden under Step 2 of the *McDonnell Douglas* analysis.  *Id*. at 21-22.

Proceeding to Step 3 of the analysis, American Re argues that Plaintiff cannot provide the Court with any "competent, admissible evidence that the Company's legitimate reason for her termination is a pretext for invidious, deliberate discrimination," and submits that the record clearly establishes that gender discrimination played no part in her dismissal.  *Id*. at 18. American Re alleges in particular that:

- The Executive Committee selected Plaintiff over a qualified male candidate.

- Two of the four SMG members who reported to Mr. Engshuber were female.

- Ms. Bintliff-Ritchie was granted a 21% salary increase after six months of employment at American Re.

- Two male employees were terminated at the same time as Ms. Bintliff-Ritchie, also for poor performance.

*Id*. at 21-22.

American Re dismisses Plaintiff's allegations that five other members of the SMG "underperformed" yet were not fired for their performance as "self-serving," "speculative," and not buttressed by any competent evidence.  *Id*. at 19-20.  American Re highlights Ms. Bintliff-Ritchie's deposition testimony, in which she allegedly admits not having any personal knowledge of the performance of the SMG members at issue.  Def. Br. at 20.  American Re concludes that, in light of this evidence, "there is simply no basis for [P]laintiff to argue that American Re's legitimate business reasons for terminating her employment were somehow a pretext for intentional sex discrimination."  *Id*. at 22.  American Re contends that Plaintiff has therefore

16

failed to meet her burden under Step 3 of the *McDonnell Douglas* analysis.

Predictably, Ms. Bintliff-Ritchie takes exception with Defendant's characterization of the facts.  She responds that there is in fact "much evidence in the record to belie" American Re's contention that it fired Ms. Bintliff-Ritchie on grounds of job performance.  Pl. Opp'n at 10.  First, Plaintiff claims that there was "no mention or reference to Ms. Bintiliff-Ritchie's alleged poor performance in her termination letter," in her performance reviews, or at her exit interview.  *Id*. at 11.  Plaintiff also contends that the allegations that her dismissal was performance-related are inconsistent with her "outstanding" performance review and 21% pay increase in July 2003, and that the 90% satisfaction rating earned by her department in an internal survey proves that she was performing well.  *Id*.

Second, Ms. Bintliff-Ritchie contests Defendant's argument that the Synhrgy contract was evidence of her poor performance.  She claims that Mr. Engshuber approved and signed the contract with Syhrgy, and did so with the Executive Committee's approval.  *Id*. at 12.  Plaintiff also argues that she agreed with Mr. Phelan's decision to rescind that contract, and cooperated with him in obtaining that result.  *Id*.

Third, Plaintiff contends that Mr. Engshuber approved all of her personnel decisions, including the decision to terminate the employment of Ms. Luongo, and the decision to diversify the Human Resources Department.  *Id*. at 12.

Finally, Ms. Bintliff-Ritchie claims that the decisions to hire and terminate her were not made by the same group of individuals.  Instead, she argues that she was hired by Mr. Engshuber, and terminated by Mr. Phelan.  *Id*. at 15.  In particular, Plaintiff claims that Mr. Engshuber informed her that he disagreed with the decision to terminate her employment with American Re.

17

*Id.* Ms. Bintliff-Ritchie also alleges that Mr. Beer, another member of the Executive Committee, was not even aware that "the issue of Ms. Bintliff-Ritchie's termination was on the Committee's agenda." *Id.*

Having contested American Re's characterization of the facts, Ms. Bintliff-Ritchie offers her own perspective on the events at issue, arguing that:

- American Re replaced Ms. Bintliff-Ritchie with a male candidate, James Burke, and did not consider any female candidates for the job.

- American Re granted Mr. Burke an ICP award of $115,000 "even though that payment violated the terms of Am Re's Compensation Plan," yet denied Plaintiff her ICP award.

- American Re paid Mr. Humes $1.3 million in severance in spite of his alleged poor performance, but refused to provide Ms. Bintliff-Ritchie with a severance package.

- American Re failed to terminate or discipline five other SMGs despite their allegedly poor performance. Ms. Bintliff-Ritchie claims to have become aware of these performance issues through her work as the head of the Human Resources Department and through conversations with Mr. Engshuber.

- Ms. Bintliff-Ritchie alone, in contrast to her male peers, had "to secure Mr. Phelan's approval for . . . organization and personnel decisions . . . ."

Pl. Opp'n at 13-14. Ms. Bintliff-Ritchie claims that these events must compel the court to conclude that there remains a genuine issue of material fact as to whether American Re had a legitimate reason to dismiss her, and whether that reason was merely a pretext for gender discrimination.

This Court, however, finds Plaintiff's arguments unavailing. Since American Re conceded, for the purpose of this motion, that Plaintiff had established a prima facie case of discrimination, the Court will begin by analyzing the second step of the *McDonnell Douglas* test.

18

There is no genuine issue of material fact that American Re has met its burden of establishing that there was a legitimate, non-retaliatory reason for firing Ms. Bintliff-Ritchie. While Plaintiff makes much of the $112,500 anticipated 2003 ICP award she expected to receive, it remains beyond contention that this estimated award reflected a below-target performance on the part of Ms. Bintliff-Ritchie.  Plaintiff does not contest that the other SMGs reporting to Mr. Engshuber all met and exceeded their bonus targets.  Under the circumstances, Plaintiff's belief that she was performing competently cannot be given much weight.  *See Billet v CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (Plaintiff's "view of his performance is not at issue; what matters is the perception of the decision maker."), *overruled on other grounds by Carpenter v. Fannie Mae*, 174 F.3d 231, 236 (D.C. Cir. 1999).

Similarly, Ms. Bintliff-Ritchie cites to a 90% approval rating figure gleaned from an internal corporate survey as evidence that her personal and her department's performance were satisfactory.  The undisputed evidence is that the department was ranked the poorest performing department for the year 2003.  As highlighted by Defendant, "[t]he second-lowest performing department . . . surveyed scored 43% higher than plaintiff's department . . . ."  Def. Br. at 12.  Far from buttressing Plaintiff's claims that her performance was outstanding, this evidence tends to indicate that her performance compared poorly to that of her peers,[4] a conclusion further supported by Ms. Bintliff-Ritchie's own assessment that her performance "Needed Improvement."

---

[4]    While Ms. Bintliff-Ritchie was awarded a 21% pay increase in July 2003, the Court finds credible American Re's explanation that the raise was approved before the extent of Ms. Bintliff-Ritchie's under-performance became clear to the Executive Committee. Def. Reply at 8.

The Court therefore finds that the record establishes that there was a reasonable and non-retaliatory reason for Ms. Bintliff-Ritchie's dismissal – her performance was simply not meeting her employer's expectations.[5]

Turning to the third and final step of the *McDonnell Douglas* analysis, this Court finds that Plaintiff has failed to meet her burden of showing that American Re's explanation for the dismissal was merely a pretext for discrimination.  Indeed, the Court finds the evidence that the Executive Committee both hired and terminated Ms. Bintliff-Ritchie particularly compelling.  It seems improbable that a group of individuals responsible for hiring a member of a protected class would then dismiss her shortly thereafter on the basis of gender discrimination.  *See Young v. Hobart West Group*, 385 N.J. Super. 448, 461 (Super. Ct. N.J. App. Div. 2005) (fact that employee was hired and fired by the same person "strongly counters against an inference of . . . discrimination."), *citing Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."); *see also Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1266 n.24 (D.N.J. 1994) ("Employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.") (quotations omitted).[6]  The Court also finds that the lack of reference to Ms.

---

[5]     Given the wealth of evidence supporting the contention that Ms. Bintliff-Ritchie's job performance led to her dismissal, this Court need not address the question of whether (i) the dismissal of Ms. Luongo, or (ii) the Synhrgy contract, played a part in Plaintiff's termination.

[6]     While Ms. Bintliff-Ritchie argues that the decisions to hire and terminate her were made by Mr. Engshuber and Mr. Phelan, respectively, *see* Pl. Opp'n at 15, the Court notes that a closer look at the record, and in particular, Mr. Engshuber's

Bintliff-Ritchie's performance issues in her termination letter is far from conclusive.  American

Re may well have been unwilling to scuttle Plaintiff's hopes of future employment in such a way.

In addition, the Court finds that Ms. Bintliff-Ritchie's replacement of a male employee,

Mr. Humes, undermines to some extent the allegation that her dismissal may have been gender-

based.   Similarly, the Court finds that the evidence that Ms. Salton (another female SMG)

received the largest ICP award among all SMGs reporting to Mr. Engshuber lends credence to

Defendant's claims that Plaintiff's dismissal was not based on gender-discrimination.[7]   Finally,

deposition testimony, suggests otherwise:

> Q. Whose decision was it to hire Ms. Bintliff-Ritchie?
> A. It was a decision made by the executive committee, which I made a proposal for, to hire Joanne Bintliff-Ritchie.

Engshuber Dep. Tr. 29:7-11, Bernstein Cert. Ex. B.

> Q. . . . Do you recall returning to the office . . . and being informed by Mr. Phelan and Mr. Beer they wanted to terminate Ms. Bintliff-Ritchie's employment?

> A. That's not correct.

> Q. Did they inform you that they wanted to terminate her employment?

> A. No. There was an executive committee meeting where, since we had discussed at various pre-meetings the performance of Joanne Bintliff-Ritchie, that this was the top topic.  And we discussed it, and we then collectively made the decision to terminate Joanne.

Engshuber Dep. Tr. 161:5-19, Bernstein Cert. Ex. B.  In light of this testimony, the Court finds that there is no genuine issue of material fact that the decisions to hire and terminate Plaintiff were made collectively by the Executive Committee

[7]   The Court finds unpersuasive Plaintiff's argument that only male candidates were interviewed to replace her betrays American Re's discriminatory practices.  The Court, instead, finds American Re's explanation that "the executive search firm retained by American Re presented a slate of exclusively male finalists for the position" more convincing.  Def. Reply at 12.

the evidence that two male employees in her department were dismissed at the same time as she was, and on the same grounds, tend to indicate that Ms. Bintliff-Ritchie was legitimately terminated on performance grounds.[8]

Accordingly, this Court finds that, even drawing all reasonable inferences in favor of non-movant, there is no genuine issue of material fact (i) that Defendant has met its burden of establishing that there was a a legitimate non-retaliatory reason for its termination of Ms. Bintliff-Ritchie, and (ii) that Plaintiff has failed to establish that the non-discriminatory explanation is merely a pretext for discrimination. *Atkinson*, 460 F.3d at 454. The Court will therefore grant Defendant's motion for summary judgment on the issue of discrimination under Title VII and under New Jersey's Law Against Discrimination.

---

[8] Plaintiff argues that the discrimination to which she claims to have been subjected is best illustrated by comparing the way her male peers were treated at the company with the way she was treated.

This Court, however, finds Ms. Bintliff-Ritchie's comparisons with Mr. Burke and Mr. Humes inapposite. While Mr. Burke was indeed granted an ICP award of $115,000, that award was entirely consistent with the rules under which Ms. Bintliff-Ritchie was herself denied the award. Indeed, Mr. Burke was employed by American Re in March 2005, when the 2004 ICP bonuses were paid, and was therefore eligible for the award.

As for the severance package awarded to Mr. Humes, it was dictated by the terms of his five-year employment agreement. Ms. Bintliff-Ritchie, on the other hand, was employed at will. Accordingly, American Re's refusal to provide Ms. Bintliff-Ritchie with a severance package cannot be deemed evidence of discrimination, as Mr. Burke and Mr. Humes – not being similarly situated – are simply not proper comparators. *See Hutchins v. UPS*, No. 01-1462, 2005 U.S. Dist. LEXIS 15624, at *11 (D.N.J. July 26, 2005).

Accordingly, Plaintiff's evidence lacks any probative value, and cannot be relied upon to establish that her dismissal was actually based on gender grounds.

**III.    CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary

Judgment.  An appropriate form of Order accompanies this opinion.


Dated: February 15, 2007


      s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.